at all? Good morning, everyone. Alright, Ms. Mirza, am I Yes, yes. So you have six minutes for your primary argument, and then we'll give you one minute for rebuttal. So whenever you're ready. I'm ready. Thank you. May I please support? I'm Tahira Mirza, appearing in my own capacity. I was hired by the defendants as a trauma and critical care surgeon in 2018. I have the case that pertains to the retaliatory provisions of the federal and New York State Faults Claims Act and violations of New York labor law 741 which were arising from the retaliation that occurred due to my failure to participate in the multiple fraud in the government schemes that the defendants were engaged in, primarily in the federal Medicare fraud area, and the second claim which is the 741 also entails fraudulent DRG reimbursement processes that they were involved in, which led to the remainder of the claims, and which latched on to the federal and the New York State Faults Claims Act. The district court erroneously arrived at the conclusion that there was no protected activity or protected conduct that I engaged in. I have already established a prima facie case of retaliation. I objected to the fraudulent activity. The defendants knew that I objected to it and they retaliated on the basis of that. The district court also erroneously arrived at the conclusion that in order to engage in a protected conduct one has to show that one was doing steps necessary to file a key time action, or was investigating matters that could be leading to a key time action. However, this is not what Congress has intended and in the 2009 amendments by Congress, in addition to one of the authors, Congressman Berman, who made it very clear that this does not entail people who may be preparing to file a key time or who have filed a key time, but this also includes those people who refuse to participate in the wrongdoing. They blow the whistle either internally or externally, but they refuse to participate in this. And in my briefs to this court and the district court, I have amply showed that there has been internal reporting of fraud by myself. There has been efforts to remedy at least even one action of fraudulent activity. There have been multiple, but the case law intends that even one action where you refuse to participate is sufficient to demonstrate that you engaged in protected conduct and you let your employer know. And the other instances where I have refused to participate in the falsification of documents, refusal to up code, and opposed double billing. All of these have been detailed in the briefs. The first instance of refusal to up code, meaning to up the bill, to submit that bill to Medicare as a higher bill than what the service should be, was right at orientation. When I joined this institution, it was a five to six day orientation, and in one of those days, there was a meeting that was held by the coding supervisor and the associate director of hospital medicine who instructed us in an open room with other physicians and physician assistants sitting, that we were to code the critical care code, which is 99291 for all admissions that presented to the emergency department. Now, you cannot use that code. That is the highest level code that you can bill Medicare for a patient's visit to the emergency department. And we all know as physicians that that code cannot apply across the board to all admissions because if the patient had a femur fracture, for example, that would not go into a 99291, a critical care code. I'm sorry, I guess it's Dr. Mirza, I apologize. In the context of this case, you were not, you did not apply the codes that you're saying that were recommended, but beyond sort of refusing to engage in that, there was, were there efforts at reporting and otherwise stopping that practice from being engaged in by the facility? Yes, because the first instance in that meeting, I refused to participate in upcoding to 99291. So that's a refusal to do in the meeting. And my testimony supports that. Secondly, there was another instance, and this is on evidence. This is an email that has been attached to the briefs where this is a February 2018 incident where the bill and the corresponding note had been sent to another physician to sign off and submit, which I corrected the physician assistant. I had a discussion with her and I let her know that it's on the record that you could not be submitting this history and physical and this bill to Dr. B. Dr. B signed off the admission and submitted that bill, which was a fraud bill. And this discussion, which was happening between me and the physician assistant, was joined by the medical director and he was informed of the same thing. And he asked what was happening and to which we explained that this incorrect note and the bill had already been submitted to somebody else. The second physician signed off of it and that should not have happened. It should have come to me. This is also in my testimony and it's also in an email that I sent to Ms. Rabanel, that's part of the briefs, where I have informed her in writing that this has occurred, to which she has said, oh, I wish I did not know this. In other words, he's fraudulently attesting that he signed off the record and he signed the note and the bill was incorrectly submitted. And this is one instance. It's the second instance of fraud that occurred. And then refusing to participate in falsifying documentation. So another scheme, in order to carry out the scheme of 99291, you have to have a corresponding document in the medical record which says that critical care was provided for this many to this many, 30 to 74 minutes, and you sign off that record. That particular documentation was happening in each and every note that was coming from the emergency department. It's also in my testimony. It's also in the record where I have explained there is an email between the trauma registrar and the medical director. The description of the email is there, but the actual email was struck off in the struck off documents at the lower court, but the description clearly states where the trauma registrar is telling the medical director in an email that she does this weird thing where she makes the note her own and she takes out the physician assistant's part in the documentation, to which he replied in the email that this is an unacceptable practice and I will correct this. I will address this when she returns. So this is another instance. Okay. If you can wrap up. We have all the materials in the record. Sure, sure. If you can go slightly over your time. You'll have one minute for rebuttal. So I would just like to state that protected activity is there. A prima facie case has been established. There are multiple instances of fraudulent activity that have been happening. In addition to poor quality of patient care, which was carried out by instilling a four day rule that the length of stay of patients could not exceed four days, in which case patients that may be needing longer stays had to be discharged earlier, which is also another way of committing fraud because Medicare pays out the admission in one big lump sum, and if you discharge the patient, let's say they need seven days and you're discharging them by the fourth day, the rest of those healthcare dollars are kept by the health system. I think we have your position. You'll have another minute to respond after we hear from the attorney on the other side. Thank you. Thank you. Mr. Sacamano? May it please the court, Joseph Anthony Sacamano, Jr. for defendants at police. Your Honor, when this case was first filed, Dr. Merza was represented by counsel. The first piece of the case discovery was supervised by District Court Judge Castle. District Court Judge Castle appropriately supervised the case. Subsequently to that, when Dr. Merza made the decision to proceed pro se, the case was transferred to District Court Judge Halpern. District Court Judge Halpern appropriately administered the case. All of those issues raised in the appeal are of no merit. The court was appropriately supervised by the District Court judges. As to the merits of the summary judgment decision, plaintiff has not raised material issue of fact as to any of the causes of action that she asserted with regard to the Federal Force Claims Act and New York State False Claims Act claims. The actual evidence of the case did not establish that she engaged in protected activity. In the case, there was also, as the judge correctly found, no cause of connection between the events that led to the end of her employment and any activity that she claims was protected activity for a number of reasons, one of which was the passage of time, which is generally recognized by the District Courts and the decisions in this district. In addition, you'll note in the brief, in between the time Dr. Merza had appropriate workplace discussions with regard how to bill for medical services, she was approved to conduct surgeries independently. So certainly from the perspective of the defendants, that's a very significant fact. If the plaintiff is claiming that you're retaliating against them for speaking out, certainly the fact that you approved them to do surgeries in between would be a significant factor that that, in fact, is not what you did. With moving to the 741 claim, there's no public health issue raised in any of the facts in the case, and so that claim is appropriately dismissed. And then finally, there are several state law claims, defamation, tortious interference with contract and such, and with regard to those, Dr. Merza executed an authorization which was presented to Dr. Oxley to provide information to a subsequent potential employer with regard to her employment. So that authorization authorized him to provide the information that he provided, and so therefore there's no basis for those claims. There was no intent on behalf of the defendants to defame Dr. Merza, certainly, or to interfere with her abilities to go on and be a doctor somewhere else. Unless you have a question for me, I'd appreciate the time. Thank you. Thank you, Jonas. Actually, there are multiple disputed facts. The premise on which they did the June 1 and 2 restrictions in 2018, there was no evidence provided for that. There is no record stating what the problem was for which they restricted my ability to operate for those two days despite being asked in discovery multiple times. It's even disputed if there was a complaint that was even received on that particular gallbladder case that they refer to and use it as a case and say that this is what the restriction. And another disputed fact is that these restrictions were temporary, which nowhere in the record was it ever produced or in discovery that this was a temporary thing that they were investigating. In fact, I was informed on my June 1 meeting on phone calls with the medical director and the next day, June 2, that I would be expected to resign the following Monday without due process being taken in the hospital concerning their own bylaws when some kind of issue arises regarding any case. In addition, in addition, the authorization which I signed for them to release and sign off on a document, that release is, so whenever you get another position, the new position will send a form to the former hospital just to make sure that the physician was in good standing. So there's a form that was sent from the prospective employer to ORMC in which there were five questions. Is this person okay? Were there any trouble with any issues, etc., etc.? All of which were checked off, no. Then Dr. Oxley attached another piece of paper, which is an internal assessment. It wasn't even asked for. And despite being asked in discovery, why was this document attached? What was the reason? Do you attach it for everybody? But does that, Dr. Mirza, I mean, to the extent that you did submit something releasing people from liability for talking to references, you are still, the fact that the reference perhaps occurred in a certain way doesn't change the issue with regard to the fact that you signed a release saying that people could give information about your tenure there and not be subject to sue? Your Honour, that release is for statements made in good faith and without malice. The release says that as well. So if there was an issue and you are trying to communicate that to the next employer, then in discovery you have to tell me what that issue was. It has to be in writing. It has to go into the file. There has to be some document saying what the issue was. They have refused to provide anything. In their own summary judgment motion, there's no evidence that's attached. They rely on my exhibits and on my testimony. What exactly, so if there was an issue with some performance, that should be in a performance file. And their own procedures require that it go through a medical executive committee process and their own bylaws detail how it should be done, which wasn't done. And that's also been asked in discovery as to why the bylaws were not followed. And what was the reason for attaching this letter? Secondly, there was another employer that sent an email to the medical director asking for a reference, just a short one that has also been attached to the record, in which he refuses to give a reference, to which this was also asked in discovery as to why were you refusing to give a reference? And they have no answer. They refused to answer the interrogatories. They don't answer the document requests. In fact, there was no committee meeting that ever happened to review my performance. I think we have your position a little over time. But thank you for your argument.